UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHAWN MICHAEL MCCOWAN,

Defendant.

Case No. 2:20-cr-00151-JAD-EJY

**Report and Recommendation**

**Re: Motion to Suppress (ECF No. 32)**

Pending before the Court is Defendant's Motion to Suppress Evidence. ECF No. 32. The Court has considered Defendant's Motion, the Government's Response, and Defendant's Reply. ECF Nos. 36 and 38. The Court also held an evidentiary hearing on March 5, 2021, and has considered all testimony given and arguments made.

**I.    Background**

There is no dispute that on October 23, 2019, at approximately 11:52 p.m., Defendant was parked in a no parking zone on a public roadway (Agate Avenue), near the intersection of Las Vegas Blvd., when Las Vegas Metropolitan Police Department ("LVMPD") Officer Lukas Turley[1] pulled up behind Defendant's vehicle.[2] Defendant's vehicle was sitting (not running) in a high crime area, had no lights or emergency flashers on, and there was no evidence the vehicle was in any distress.[3] As Turley maneuvered his patrol vehicle behind Defendant's car (a Kia Forte), Defendant started his car and began to drive away.[4] This prompted Turley to turn on his patrol vehicle siren causing Defendant to stop his car.[5] Officer Turley's body camera footage shows his vehicle stopped behind Defendant's car at 11:52:06 p.m.[6]

---

[1]    Hereinafter, the "Officer," "Officer Turley" or "Turley."
[2]    Turley Testimony Time-Stamped (hereinafter "Test at __") 9:51:24-9:52:31.
[3]    *Id*. at 9:57:18-9:57:43.
[4]    *Id*. at 9:53:00-9:53:57; ECF Nos. 32 at 1 and 36 at 2.
[5]    *Id*. at 9:53:58-9:54:11.
[6]    All body camera cites reference the time elapsed on the video introduced by Defendant as Exhibit B.

During his testimony, Officer Turley explained he has patrolled the area around Agate Avenue near Las Vegas Boulevard for two-plus years; it is unusual to see cars parked along Agate Avenue; and, the location is a high crime area regularly discussed at daily briefings.[7]  Agate Avenue is bordered by a transient-frequented Emerald Suites Hotel known for narcotic trafficking, and the Manhattan apartment complex where "pimps and prostitutes" are known to live.[8]

Upon stopping his vehicle, Turley called LVMPD dispatch ("Dispatch") providing Defendant's license plate number and stating he had initiated a suspicious vehicle stop.[9]  Turley explained Dispatch automatically requested backup and ran Defendant's license plate through California DMV.[10]  Turley stated nothing was thrown from Defendant's car and he saw no furtive movements before he exited his patrol vehicle to approach Defendant.[11]  Turley also stated that he had "probable cause" to make a traffic stop because Defendant was parked in a plainly marked no parking zone.[12]

Approximately thirty-seven seconds after stopping, Turley initiated contact with Defendant.[13]  As Turley approached the driver's side of Defendant's car, he asked Defendant to roll down the back windows.[14]  Turley wanted to know if there were others in the car and, if so, how many people were inside.[15]  As confirmed by the Body Cam, Officer Turley was working alone at almost midnight when he learned there were three people inside Defendant's vehicle.[16]

Safety motivated Turley's next set of questions.[17]  Turley asked all occupants of the car "what's up guys" to which Defendant and two passengers—including a male passenger in the backseat and a female in the front passenger seat—appear to respond.[18]  The woman passenger and Defendant talk about why they are parked where they are, after which Officer Turley asked

---

7   Test. at 9:51:50-9:53:00:08; 9:57:43-9:58-25.
8   *Id.*
9   *Id*. at 9:54:20-9:54:34.
10  *Id*. at 9:54:35-9:56:36.
11  *Id*. at 11:02:06-11:02:29.
12  *Id*. at 9:51:53-9:52:02; 9:57:26-9:57:28; 11:10:15-11:10:30.
13  Body Cam at 00.37.
14  *Id*.; Test. at 9:55:52-9:55:55.
15  Test at 9:55:55-9:56:02.
16  Body Cam at 00:37; Test. at 9:51; 9:55:58-9:56:10.
17  *Id*. 9:58:36-9:58:45.
18  Body Cam at 00:42-1:10.

2

Defendant for identification.[19]  While Defendant is getting to and pulling out his identification, Officer Turley asked if there are any weapons in the car, to which Defendant responded no.[20]  In a five second interaction, Turley then asked the backseat passenger if he had identification to which the passenger said no, but that he had a credit card with his name on it.[21]  Officer Turley responded, "I just asked you.  That's cool."[22]  At this time, Defendant still had not handed Turley his driver's license.[23]  Officer Turley next asked the passenger if he has ever had a driver's license, which he did (or does) in Nevada.[24]  Just as Defendant handed Officer Turley his driver's license, the Officer asked the female passenger if she had ID on her.  She did not.[25]  Officer Turley then asked the back seat and front seat passengers for their names and dates of birth.[26]  These interactions with Defendant's passengers, including the time Turley was waiting for Defendant to gather and hand him his driver's license, was less than one minute.[27]  Excluding the time Turley was simultaneously waiting for Defendant's driver's license, the interaction, including writing down names and birthdates, took 40 seconds.[28]

As evidenced by the Body Cam video, at no point during the exchanges between Turley and the passengers did either passenger questions why Officer Turley asked for their names.  Neither passenger evidenced any objection to providing the information asked for by Turley.  And, neither passenger refused to provide his/her name.  Approximately one minute and forty-five seconds elapsed from the time Officer Turley first spoke with Defendant until he returned to his patrol car.[29]

When Officer Turley returned to his patrol vehicle, his mobile data unit (the computer in the vehicle) had auto-populated with information regarding Defendant's car registration, which confirmed Defendant was the owner of the car.[30]  Officer Turley then entered Defendant's Nevada

---

[19]     *Id*. at 1:11.
[20]     *Id*. at 1:15.
[21]     *Id*. at 1:18-1:23.
[22]     *Id*. at 1:23.
[23]     *Id*. at 1:24.
[24]     *Id*. at 1:25-1:29.
[25]     *Id*. at 1:31-1:32.
[26]     *Id*. at 1:43-2:11.
[27]     *Id*. at 1:18-2:11.
[28]     *Id*. at 1:31-2:11.
[29]     *Id*. at 00:37-2:12.
[30]     Test. at  9:59:51-10:00:28; 10:08:00-10:08:08.  In his Motion, Defendant erroneously contended that Turley did not appear to check Defendant's car registration.  ECF No. 32 at 2.

driver's license into the mobile data terminal to determine if the license was valid and to look for warrants.[31]  Defendant's driver's license was propped up on the front of the mobile unit screen as Turley did this query.[32]  The query was entered on the same screen Turley uses in all traffic stops.[33]

Upon entering Defendant's driver's license, Turley's computer screen automatically populated with information from the DMV, LVMPD's SCOPE, the National Crime Information Center ("NCIC"), and the Nevada Criminal Justice Information System ("NCJIS").[34]  Turley did not recall what information he received regarding Defendant's driver's license, but testified it was not an issue.[35]

Turley explained that as he moved the cursor on the mobile unit screen from one line to another, information from the source entity (e.g. NCIC or NCJIS) automatically populated at the bottom of the screen.[36]  Turley further explained that the screen he reviewed to determine whether Defendant had any active warrants (Defendant did not) is the same screen that displayed Defendant was a convicted sex offender who failed to properly register under Nevada law and, therefore, had committed a felony.[37]  This screen is obvious in the Body Cam footage as it displays red entries.[38]  Officer Turley testified that the red entries included the words "Failed" and "Felony" meaning Defendant failed his annual verification and that he was in violation of NRS 179D.550.[39]  Turley did no special search for this information.[40]

Turley testified that upon seeing Defendant had committed a felony, he decided to place Defendant under arrest.[41]  This was three minutes and forty-three seconds after Officer Turley started

---

31    *Id*. at 10:00:27-10:00:42.
32    Body Cam at 2:39.  Despite Defendant's contention in his Motion to Suppress that Officer Turley searched the male passenger's information first, at the hearing Defendant conceded that Turley had no one's driver's license other than Defendant's license to input into the driver's license query, which was the first query Turley did on his computer. *Compare* ECF No. 32 at 8 and Test. at 11:25:05-11:25:12; 11:34:29-11:34:36.
33    Test. at 10:29:03-10:29:14.
34    *Id*. at 10:00:50-10:01:04; 11:03.
35    Defendant erroneously contended that Turley did not appear to verify Defendant's driver's license.  *Compare* ECF No. 32 at 2 and Test. at 11:34:10-11:34:17.
36    Test. at 11:26:13-11:26:56.
37    *Id*. at 10:01:04-10:01:16; 10:01:44-10:02:13; 10:30:12-10:30:22; 11:34:00-11:34:06.
38    Body Cam at 3:43.
39    Test. at 10:29:52-10:30:11.
40    *Id*. at 10:01:05-10:01:16; 10:02:05-10:02:13; 10:29:28-10:29:45; 10:30:12-10:30:22.
41    *Id*. at 10:02:28-10:02:42; 10:30:45-10:30:51.

his Body Camera and just over three minutes after he first made contact with Defendant.[42]  At this juncture, the stop ripened from a suspicious vehicle with a traffic violation to a felony violation supporting a probable cause arrest.[43]  Turley explained he turned off his Body Camera stating he intended to call his backup, who had not yet arrived, to explain who he had in the car and what he learned about that individual.[44]

Turley did not immediately initiate Defendant's arrest.[45]  Turley explained he would not effectuate an arrest alone when there were three occupants of Defendant's vehicle, two of whom did not have identification.[46]  Importantly, the uncontracted evidence is that Turley ran the names and birth dates of Defendant's passengers while he was waiting for his backup to arrive.[47]  Once backup (Officer Childs) arrived, Turley discussed the situation with Childs for "safety reasons," and they decided to approach the car to arrest Defendant.[48]

After approaching Defendant's vehicle, Defendant exited his car and was placed in handcuffs.[49]  Turley told Defendant he was being arrested for failing to register in compliance with Nevada sex offender laws.[50]  Officer Childs also placed the male passenger, Andre Clark ("Clark")

---

[42]      *Id*. at 10:30:51-10:31:00; Body Cam at 3:43.

[43]      On cross examination the defense asked Turley questions suggesting he did an impermissible criminal background search on Defendant.  Test. at 11:28-11:30; 11:32; 11:45-11:46.  In response, Turley explained that there is no sex offender database, but such information would display under NCIC or NCJIS as a warrant.  *Id*. at 11:32:10-11:32:21.  Turley stated that after reviewing Defendant's driver's license information he stopped on NCJIS, which showed no warrants, but instead showed, and would ordinarily show, the non-compliant sex offender information leading to Defendant's arrest.  *Id*. at 10:30:12-10:30:22; 11:34:00-11:34:06; 11:37:19-11:37:56.  Responding to questions, Turley confirmed that NCJIS *could* contain criminal history, but when the defense ask whether Defendant's criminal history was located or reviewed, Turley stated this occurred only as a result of Defendant's driver's license search.  *Id*. at 11:35:30-11:35:57; 11:37:37-11:37:53; 11:46:46-11:47:02.  There was no testimony that Turley did a specific search for or reviewed Defendant's criminal history except as would ordinarily be available when reviewing the return on a driver's license.

Defendant also introduced Exhibit E, a single page from the LVMPD manual with which Turley is familiar.  *Id*. at 11:39.  This page contains information regarding conducting criminal history queries during traffic stops.  However, the uncontradicted testimony is the only query done regarding Defendant was the entry of Defendant's driver's license yielding automatic results from various sources that included the sex offender registration information found on Defendant.  *Id*. 10:01:04-10:01:16; 10:01:44-10:02:13; 10:30:12-10:30:22; 11:34:00-11:34:06; 11:37:19-11:37:56.  There is no evidence that a Triple I search or separate search for Defendant's criminal history was done.

[44]      *Id*. at 10:03:17-10:03:40; 10:31:24-10:31:38.

[45]      *Id*. at 10:02:42-10:02:50.

[46]      *Id*. at 10:02:51-10:03:14.

[47]      *Id*. at 10:00:56-10:04:04; ECF No. 36 at 3.

[48]      *Id*. at 10:05:05-10:05:48.

[49]      *Id*. at 10:55:55-10:06:15.

[50]      *Id*. at 10:06:16-10:06:30.

1   under arrest for his active warrants; and the female passenger, who had provided Turley a false name

2   and birthdate, was subsequently arrested on active warrants and possession of illegal drugs.[51]

3       Because Defendant was the only individual with a driver's license, and the car was parked

4   illegally on a public road, Turley called for a tow.[52]   In compliance with LVMPD policy, an

5   inventory was done before the car was towed.[53]   Officer Childs did the inventory while Officer

6   Turley took notes.[54]   Officer Childs completed the inventory sheet.[55]   Two weapons were found in

7   the car during the inventory.[56]   One was under the driver's seat and the second on a speaker within

8   reach of the backseat passenger, Clark.[57]   On July 1, 2020, a federal grand jury, sitting in the District

9   of Nevada, issued a one count indictment against Defendant.[58]

10  **II.    The Parties' Arguments**

11          A.      Defendant's Argument.

12      In closing argument, Defendant summarized the support for suppression as two-fold: Officer

13  Turley unlawfully prolonged the traffic stop when he (1) asked Defendant's passengers for

14  identification and dates of birth, and (2) investigated Defendant's criminal history and sex offender

15  registration without justification.[59]   Defendant argued these tasks were unrelated to the traffic

16  mission, unsupported by reasonable suspicion, and added impermissible time to the stop.[60]

17  Defendant contends that once information came up on his mobile data terminal after entering

18  Defendant's driver's license, Officer Turley could not scroll through that information to determine

19  if Defendant had active warrants (suggesting this information would show without having to do so)

20  or act on information learned because Turley was "limited to 'checking the driver's license,

21  determining whether there are outstanding warrants …, and inspecting the automobile's registration

22

23

---

24  [51]     *Id*. at 10:06:50-10:07:38.
    [52]     *Id*. at 10:07:42-10:08:17.
25  [53]     *Id*. at 10:08:08-10:08:47.
    [54]     *Id*. at 10:08:47:10:09:07.
26  [55]     *Id*. at 10:09:06-10:09:41.
    [56]     *Id*. at 10:09:41-10:09:57.
27  [57]     *Id*. at 10:10:00-10:10:30.
    [58]     ECF No. 11.
28  [59]     Closing Argument ("Closing") at 1:00:02-1:00:35; ECF No. 32 at 7.
    [60]     Closing at 12:56:58-12:17:09; 1:02:51-1:03:20.

and proof of insurance.'"[61]    Defendant argued that Turley admitted Defendant had no active warrants, but searched Defendant's criminal history adding time to the traffic stop without justification.[62]  Defendant takes issue with Turley asking Defendant's passengers for their names and birth dates because, Defendant argues, this information would not make Turley safer.[63]

Defendant does not dispute that Turley's review of Defendant's information revealed he was a registered sex offender or that he was in violation of NRS 179D.550 for failing to fulfill his annual verification requirements.[64]  Defendant also does not dispute that violation of NRS 179D.550 is a felony (see NRS 171.124) authorizing his arrest.[65]

B.    The Government's Argument.

After making a lawful traffic stop on Defendant's car, obtaining Defendant's driver's and his passenger's names and birth dates, Officer Turley "immediately used the computer in his car to input the information from … [Defendant's] driver's license to conduct a records check."[66]  This standard records check revealed that Defendant was a registered sex offender in violation of NRS 179D.550, which is a felony.[67]  Demonstrating Turley checked Defendant's car registration through LVMPD Dispatch, and driver's history through Nevada DMV, Turley's testimony confirmed the argument

---

[61]    ECF No 32 at 7-8 *citing Rodriguez*, 575 U.S. at 355; Closing at 1:01:27-1:02:04. the defense also argued that there was no evidence to support Officer Turley's suspicious vehicle stop or that the location of the stop is a high crime area. Closing. at 12:54-12:55.  As discussed below, the Court finds this argument lacks merit.  The Court notes that Defendant admits Turley testified on direct and cross examination that, although he found the location and condition of Defendant's car suspicious, he was also making a traffic stop based on Defendant's illegally parked car. *Id*. at 12:56
[62]    Closing at 1:04.
[63]    ECF No. 32 at 7-8.
[64]    *See* ECF No. 32.
[65]    *Id*.  Nonetheless, in his Motion to Suppress, Defendant contended Officer Turley "deviated almost immediately from his traffic mission by running a background check" on Defendant's passenger - Clark. ECF No. 32 at 8.  Defendant stated that instead of completing the traffic mission, "Officer Turley began his traffic mission by investigating Andre Clark." *Id*.  Defendant argued that the "Communications Event Search," attached as Exhibit C to his Motion, showed Officer Turley determined Clark "was a wanted suspect" six minutes after Turley made the traffic stop. *Id*.  Defendant appeared to assume that "Turley must have detoured from his traffic mission in order to investigate Andre Clark" arguing this was "inversely related to any concern about officer safety." *Id*.  Defendant argued that it was only after the inquiries regarding Clark that Turley determined Defendant was a sex offender and noncompliant with his registration requirements. *Id.* 8-9.  Defendant concluded his Motion by stating that because there was no "indication" Turley checked Defendant's driver's license, car registration or insurance, it appeared that "Turley deviated from his traffic mission almost immediately by investigating … Clark and … [Defendant] on non-traffic related matters." *Id*. at 9.  Each of these contentions was disproved during the evidentiary hearing (*supra* at 2-4) and were abandoned in Defendant's closing argument to argue the almost immediate deviation from the traffic stop occurred when Turley asked Defendant's passengers for identification.  Closing at 1:00:05-1:00:35.
[66]    ECF No. 36 at 2 *citing* Body Cam at 2:37; Closing at 12:47:32-12:48:30.
[67]    *Id*. at 3, 5.

that he did not do any separate background check to locate Defendant's non-compliant sex offender status.[68]  Citing to the Body Camera footage, the Government demonstrated that (1) Turley did not command once, let alone repeatedly, that Defendant's passengers provide their names or dates of birth, (2) the passenger's voiced no objection to Turley's request for this information, and (3) Turley stated "That's cool" when Clark said he did not have identification on him.[69]

The Government proffered that this case meaningfully differs from the Ninth Circuit decision in *United States v. Landeros*.[70]  The Government discussed the *United States v. Diaz-Castaneda*[71] and *United States v. Hicks*[72] holdings that there is no Fourth Amendment violation when passenger information is requested, freely given, and does not measurably prolong a traffic stop.[73]  The government also points out that Defendant's argument regarding Turley's check of Clark's identification completely bypassed the evidence showing Turley only had and checked Defendant's driver's license before checking anything regarding Clark.[74]

The Government further argued the Court need not consider what occurred after Officer Turley had probable cause to arrest Defendant because everything after this point did not prolong a traffic stop, but pertained to the Defendant's probable cause arrest.[75]  The Government points out that neither of Defendant's passengers is named in this case and neither has brought a motion to suppress evidence.[76]  The Government contends that the inventory of Defendant's car was not challenged by Defendant at the evidentiary hearing, and that, in any event, the car had to be towed because it was on a public road and there was no licensed driver available to move the car.[77]  The inventory was done prior to the tow, in compliance with LVMPD policy, resulting in the discovery of two handguns.[78]

---

[68]    Test.  at  9:59:52-10:00:28;  10:08:00-10:08:08;  10:00:27-10:00:42;  10:01:04-10:02:13;  10:29:03-10:29:14; 10:30:12-10:30:22; 11:35:30-11:35:37; 11:37:37-11:37:53; 11:46:46-11:47:02.
[69]    Body Cam at 1:18-1:23; 1:31-1:32; 1:43-2:11.
[70]    *United States v. Landeros*, 913 F.3d 862  (9th Cir. 2019); Closing at 12:40-12:42.
[71]    494 F.3d 1146 (9th Cir. 2007).
[72]    Case No. 2:18-cr-00374, 2019 WL 2905047 (D. Nev. July 5, 2019).
[73]    Closing at 12:39; 12:43-12:44.
[74]    *Id*. at 12:45:29-12:46:35.
[75]    *Id*. at 12:46:41-12:47:30.
[76]    *Id*. at 12:51-12:52.
[77]    *Id*. at 12:52:30-12:53:37.
[78]    *Id*.

C.    Defendant's Reply in Support of Motion to Suppress.

In his Reply brief, Defendant argues that "[i]rrespective of the length and substance of Officer Turley's queries, the officer deviated from, and consequently added time to, the stop when he asked the passengers for their names and birthdates."[79]  Defendant cites to *Landeros*, which held that "[a] *demand* for a passenger's identification is not part of the mission of a traffic stop."[80]  Defendant noted that the time between asking for Defendant's license and "finishing his notes," which consisted of writing names and birthdates, "was approximately 45 seconds."[81]  Defendant concluded his Reply by arguing that because Defendant's arrest was unlawful based on an impermissibly prolonged traffic stop, the inventory search of Defendant's car was unlawful requiring suppression of the ammunition and handguns found in Defendant's car.[82]

**III.    Discussion**

A.    Officer Turley was a Credible Witness, and there was Reasonable Suspicion for the Investigatory Stop.

Officer Turley was a credible witness.  His testimony was undisputed and supported by body camera video.  To this end, Defendant is wrong when he contends that there is no evidence to support Turley's testimony that Agate Avenue near Las Vegas Blvd. is a high crime area and that Turley had no lawful basis to make a suspicious vehicle stop.  Turley testified that he has patrolled the area in which Defendant was located for two-plus years, received regular daily briefings regarding crime in the area (including drug trafficking and prostitution), it is unusual to see cars parked where Defendant was parked, Defendant was illegally parked, the car was not running, there were no lights on or hazards flashing, and there was no evidence the car was in distress.[83]  Based on his training, briefings, and years of experience, Turley testified that he found the condition and location of

---

[79]    *Id*. at 2.
[80]    913 F.3d at 868 (emphasis added).
[81]    ECF No. 38 at 3.  Defendant also argued that in order for Turley to have discovered Defendant was out of compliance with Nevada law requiring his annual sex offender registration requirements, Turley would have to engage in something "akin to an ex-felon registration check … or Triple I check … ."  *Id*. at 4.  Defendant contended that a DMV inquiry would not "result in sex offender noncompliance information" and that Officer Turley must have had a "hunch" that Defendant "had violated the law.  *Id*. at 5.  But, Defendant elicited no testimony regarding a "hunch," and introduced no evidence to support these arguments.  Attorney argument is not evidence.  *United States v. Huntoon*, Case No. CR-16-00046-001-TUC-DCB (DTF), 2018 WL 1755788, at *1 (D. Ariz. Apr. 12, 2018).
[82]    *Id*. at 5-6.
[83]    *Supra* at 1-2.

Defendant's car suspicious and in violation of a no parking zone.[84]  The undisputed facts and Officer Turley's testimony demonstrate Turley properly relied on common sense and "probabilities"[85]; and, that he did not need "to ignore … [the] location [of Defendant's car] in determining whether the circumstances … [were] sufficiently suspicious to warrant further investigation."[86]

If Defendant is arguing that investigating a suspicious vehicle was Turley's "subjective intentions" and the traffic stop was a ruse, Defendant's argument fails because the subjective intentions of an officer "play no role in ordinary, probable cause Fourth Amendment analysis," and "the Fourth Amendment's concerns with "reasonableness' allows certain actions to be taken in circumstance, whatever the subjective intent."[87]  "[T]he standard for determining whether … reasonable suspicion exists is an objective one; it does not turn … on the subjective thought processes of the officer, so long as the facts known to the officer amount to reasonable suspicion."[88]  Further, "[t]he fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop."[89]  For this reason, even assuming Officer Turley made a subjective determination regarding Defendant's vehicle being suspicious, well settled law establishes that "[a] traffic violation alone is sufficient to establish a reasonable suspicion."[90]

The Court finds Officer Turley had reasonable suspicion to believe Defendant's car was a suspicious vehicle based on all the information available at the time of the stop.[91]  The determination

---

[84]    *Supra* at 2.

[85]    In *Kansas v. Glover*, __ U.S. __, 140 S.Ct. 1183, 1190 (2020), the Supreme Court stated that "the reasonable suspicion inquiry falls considerably short of 51% accuracy, … for as … [the Court] ha[s] … explained, to be reasonable is not to be perfect." *Id.* (internal citations and quote marks omitted).  In fact, "[r]emoving common sense as a source of evidence … would considerably narrow the daylight between the showing required for probable cause and the less stringent showing required for reasonable suspicion." *Id.* (internal citations and quote marks omitted).  "[O]fficers, like jurors, may rely on probabilities in the reasonable suspicion context." *Id.* (citation omitted).

[86]    Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support reasonable, particularized suspicion that a person is committing a crime, … officers are not required to ignore … a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (internal citation omitted).  "In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot demand scientific certainty from judges or law enforcement officers where none exists." *Id.* at 124-25.

[87]    *Whren v. United States*, 517 U.S. 806, 813-14 (1996).

[88]    *United States v. Magallon-Lopez*, 817 F.3d 617, 675 (9th Cir. 2016) (internal citation omitted).

[89]    *United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000) (citing *Whren* 517 U.S. at 810).

[90]    *U.S. v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2000) (internal citations omitted).

[91]    *Glover*, 140 S.Ct. at 1190; *Wardlaw*, 528 U.S. 123-25.

that a lone car, illegally parked at midnight, in a high crime area, neither running nor showing any sign of distress, supports an objectively reasonably suspicion to investigate a vehicle.[92]

      B.   <u>The Valid Traffic Stop was not Impermissibly Prolonged.</u>[93]

          *1.   Requesting identifying information from Defendant's passengers was lawful and justified by officer safety.*

    A search without a warrant is "presumed to be unreasonable," and therefore a violation of the Fourth Amendment prohibition against unreasonable search and seizure, "unless it satisfies one of the 'specifically established and well-defined exceptions.'"[94]  Analyzing the scope of the Fourth Amendment in the context of a traffic stop, the United States Supreme Court issued its 2015 decision in *Rodriguez v. U.S.*[95]  The *Rodriguez* Court held that "[a] seizure for a traffic violation justifies a police investigation of that violation."[96]  The "tolerable duration of police inquiries" during a traffic stop depends on the "mission" of the stop—that is, "to address the traffic violation that warranted the stop, ... and ... related safety concerns ... ."[97]  As stated by the Court, "[b]ecause addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose."[98]  Authority for the seizure ends "or reasonably should have ended" when the "tasks tied to the traffic infractions … are completed."[99]

    The *Rodriguez* Court also recognized that an officer's mission during a traffic stop includes inquiries such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile registration and proof of insurance" because these

---

[92]    *Terry v. Ohio*, 392 U.S. 1, 27 (1968) ("in determining whether the officer acted reasonably ..., due weight must be given ... to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience"); *United States v. Lopez*, 757 Fed.App'x 589 (9th. Cir. 2018) (even assuming "the initial contact between the officers and Lopez implicated the Fourth Amendment, the officers had reasonable suspicion to conduct an investigatory stop based on the perceived violation of California Vehicle Code § 5200(a) and the 911 call that initially drew them to the scene) *citing United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (reasonable suspicion is "not a particularly high threshold"); *United States v. Sanchez-Sosa*, Case No. 10-20108-01-KHV, 2011 WL 663180, at *5 (D. Kan. Feb. 14. 2011) ("[c]ourts recognize that a car parked in the lot of a closed establishment can contribute to an officer's reasonable suspicions) (internal citation omitted).

[93]    Parking violations justify the investigatory stop of a vehicle.  *Choudhry*, 461 F.3d at 1100-01.  Thus, Officer Turley had reasonable suspicion to conduct an investigatory traffic stop on Defendant's illegally parked car.

[94]    *Hicks*, 2019 WL 2905047, at *6 (citation omitted).

[95]    575 U.S. 348 (2015).

[96]    *Id*. at 354.

[97]    *Id*. (citations omitted).

[98]    *Id*. (citations and quote marks omitted).

[99]    *Id*. (citations omitted).

"negligibly burdensome precautions" ensure the safe and responsible operation of vehicles on the road.[100] *Rodriguez* made clear that "[t]he seizure remains lawful only so long as [unrelated] inquiries do not *measurably* extend the duration of the stop."[101] *Rodriguez* also recognizes that traffic stops may implicate "officer safety interest[s] because they "are especially fraught with danger to police officers."[102]   "The terrifying truth is that officers face a very real risk of being assaulted with a dangerous weapon each time they stop a vehicle."[103]

Defendant relies heavily on the Ninth Circuit decision in *Landeros* to support his contention that any inquiries into Defendant's passengers unlawfully prolonged this traffic stop.  But, the facts in *Landeros* are considerably different from the facts here.  In *Landeros*, an officer stopped a vehicle for speeding after which he asked two women in the backseat of the car for identification because the officer thought the women were violating curfew and underage drinking laws.[104]   Thereafter, admitting he did not think the front seat passenger was underage, the officer nonetheless "commanded," and "repeated his demand," that the passenger, Landeros, provide identification, which Landeros refused to do.[105]  The officer called for backup because Landeros refused to provide identification and, after the second officer arrived, he also asked Landeros to provide ID.[106]  Considering all of the circumstances surround Landeros' eventual arrest and indictment, including "several minutes of additional questioning," the Ninth Circuit concluded that "[a] demand for a passenger's identification is not part of the mission of a traffic stop."[107]   It is this sentence upon which Defendant seizes to argue that when Officer Turley asked Defendant's passengers if they had

---

[100]    *Id*. at 355, 357.

[101]    *Id*. (bracket in original, internal citations and quote marks omitted, emphasis added).

[102]    575 U.S. at 356.  Consider the 1997 U.S. Supreme Court decision in *Maryland v. Wilson*, 519 U.S. 408, 413 (1997), in which the Supreme Court stated, "Regrettably, traffic  stops may be dangerous encounters.  In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops."  *See also Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) ("[A]pproximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile."); *Theney v. City of Los Angeles*, Case No. 15-9602, 2017 WL 10743001, at *7 (C.D. Cal. June 19, 2017) (citing U.S. Department of Justice 2014 Statistics on Law Enforcement Officers Killed and Assaulted (available at *http://ucr.fbi.gov/leoka/2014/home*), stating: "In 2014, 4,022 officers were assaulted during traffic stops, and 9 officers were killed.").

[103]    *U.S. v. Garcia*, 279 F.Supp.2d 294, 302 n.1 (S.D.N.Y. 2003) (citing Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted (1999)).

[104]    913 F.3d at 864.

[105]    *Id*. at 865.

[106]    *Id*.

[107]    *Id*. at 868.

identification and obtained their names and dates of birth, an impermissibly prolonged traffic stop occurred.

However, several cases decided after *Landeros* have distinguished the facts and conclusion in that case from cases in which a passenger neither refuses nor questions an officer's request for identification.[108]   In fact, Ninth Circuit case law holds that a law enforcement officer may "ask people [including passengers in cars] who have been legitimately stopped for identification without conducting a Fourth Amendment search or seizure."[109]

In *Hicks*, the District of Nevada summarized the basis for the holding in *Landeros* noting that Landeros refused to provide an ID, or even his name, resulting in the officer calling for backup.[110] When the second officer arrived, he too was unsuccessful when ordering Landeros to provide identification.[111]  "Both officer then repeatedly ordered Landeros to exit the car" ultimately leading to the discovery of bullets in Landeros' pocket "during a consensual search."[112]   Landeros was thereafter indicted for being a felon in possession of ammunition.[113]  Stating that Landeros "lawfully refused to provide his ID," but the officer's continued to detain him, the court concluded that "the interactions with Landeros were clearly tangential to the traffic stop's mission … ."[114]   Critically, the court in *Hicks* did "not read" the Ninth Circuit's decision in *Landeros* "to categorically prohibit officers from *requesting* a passenger's ID during a traffic stop without reasonable suspicion that he had committed a crime."[115]

---

[108]      *Hicks*, 2019 WL 2905047, at *10 *citing Diaz-Castaneda*, 494 F.3d at 1152 (brackets in original); *see also United States v. Crenshaw*, (discussing *Landeros* and *Evans*, and stating that "[t]he context of both cases was the prolongation of a stop after a traffic infraction had been resolved to pursue additional investigations" while the defendant Crenshaw was questioned during the traffic investigation); *United States v. Hampton*, 374 F.Supp.3d 1115, 1121 (D. Kansas 2019).

[109]      *Hicks*, 2019 WL 2905047, at *10 *citing Diaz-Castaneda*, 494 F.3d at 1152.  The court in *Hicks* noted that a 2011 unpublished Ninth Circuit case cited *Diaz-Castaneda* when "concluding that a police officer may also lawfully conduct a records check on passengers using his or her identification.'"  *Id. citing United States v. Evans*, 445 Fed.App'x 29, 31 (9th Cir. 2011) (internal brackets omitted).  Further, in *Landeros*, the Ninth Circuit found it did not need to reach the question of whether the decision in *Rodriguez* overruled the holding in *Diaz-Castaneda* because "[r]egardless of whether the *first* request for Landeros's identification was lawful, law enforcement's refusal to take 'no' for an answer was not."  *Landeros*, 913 F.3d at 870.

[110]      *Hicks*, 2019 WL 2905047, at *10 (citation omitted)

[111]      *Id*. (citation omitted).

[112]      *Id*. (citation omitted).

[113]      *Id*.

[114]      *Id*. at 11.

[115]      *Id*. (emphasis in original).

Here, Officer Turley did not demand or command Defendant's passengers provide him ID or their names and dates of birth. Rather, he asked and they readily complied.[116] There was no objection or concern expressed by either passenger made in response to Turley's request.[117] Further, the request for Clark's ID occurred simultaneously with Turley waiting for Defendant to hand Turley his identification.[118] When Clark said he did not have ID, but had a credit card with his name on it, Turley said: "That's cool. I'm just asking."[119] This interaction took five seconds. Once Defendant handed Turley his ID, the Officer asked the front seat passenger if she had ID. She did not.[120] This interaction took two seconds. Officer Turley then asked each passenger for his/her name and birth date, which took 28 second.[121] Officer Turley testified that he sought this information for officer safety reasons.[122]

An interaction with a passenger while waiting for a driver to gather his identification cannot prolong a traffic stop.[123] Thus, the five seconds during which Officer Turley asked Clark for identification, and learned Clark had only a credit card on him, had no impact on the length of Defendant's traffic stop. Similarly, when Officer Turley followed up by asking the passengers for their names and dates of birth, to which neither objected, he was doing so to determine with whom he was interacting. This "*de minimus* … intrusion," arising from "danger to … [O]fficer [Turley] associated with the traffic stop itself" did not unlawfully prolong this traffic stop.[124] Turley was alone, at night, in a high crime area, approaching an unlawfully parked vehicle with three people inside. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, … *and attend to related safety concerns* … ."[125] Precisely for safety reasons Officer Turley took "certain negligibly

---

[116]    Body Cam at 1:18-2:11.
[117]    *Id*.
[118]    *Id*. at 1:18-1:23.
[119]    *Id*. at 123.
[120]    *Id*. at 1:31-1:32.
[121]    *Id*. at 1:43-2:11.
[122]    Test. at 9:58:36-9:58:45.
[123]    *Hicks*, 2019 WL 2905047, at*11 (running passenger background and criminal history "parallel to" investigation into driver did not prolong the traffic stop).
[124]    *Rodriguez*, 575 U.S. at 349 distinguishing the facts of *Pennsylvania v. Mimms*, *supra*, 434 U.S. at 110.
[125]    *Id*. at 354 (internal citation omitted).

burdensome precautions in order to complete his mission … ."[126]  Given that Officer Turley was alone, at midnight, on a street where cars do not typically stop, speaking with three individuals in a car with its lights off and in no distress, which could, presumably, have stopped in a lawful location (such as parking in a lot associated with the Budget Suites or the apartment complex nearby), the less than one minute safety related inquiry did not measurably prolong this traffic stop.[127]

Defendant contends that these inquiries were unrelated to writing Defendant a traffic ticket. Even if true, Defendant fails to consider the safety issue facing Turley given the recognized danger associated with even ordinary traffic stops.  There is no evidence that Officer Turley sought to make inquiries to detect additional or general criminal activity.  Indeed, the only evidence comes from Turley's testimony that consistently and only refers to gathering information for safety purposes. Further, there is no evidence that the mission of the traffic stop had ended at the point that Officer Turley requested identification information from the passengers.  Indeed, requesting passenger identification occurred before Turley returned to his patrol vehicle to review Defendant's driver's license and warrant status.[128]

Turley was never asked if he intended to write Defendant a ticket, but only that once he learned through his records check that Defendant was a felon, whether he would place Defendant under arrest.[129]  At that juncture, the traffic stop ripened into one of probable cause to arrest Defendant who had committed a felony.[130]  In neither his Motion nor during the evidentiary hearing did Defendant argue that Officer Turley lacked probable cause to arrest Defendant.  In fact, Defendant does not mention this fact at all and instead argued that Turley did not need passenger identification to write Defendant a ticket.[131]  Defendant's ignores (1) the importance of Turley's safety, (2) that the inquiries into the passengers' identification took less than one minute, (3) there

---

[126]    *Id*. at 356 (internal citation omitted).
[127]    Body Cam at 1:23-2:11.
[128]    Body Cam at 1:18-2:12.
[129]    Test. at 10:02:28-10:02:42; 10:30:45-10:30:51.
[130]    "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable person to believe that an offense has been or is being committed by the person being arrested."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citation omitted).  "Alternatively, [the Ninth Circuit] has defined probable cause as follows: when under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime."  *Id*. (citation, bracket added, and internal brackets omitted).
[131]    Closing at 12:56:57-12:57:05.

was no objection by the passengers to Turley's requests, (4) Ninth Circuit case law establishing that asking for passenger identification is not an unlawful Fourth Amendment search or seizure, and (5) that when Turley returned to his vehicle he did exactly what he was supposed to do—ran Defendant's driver's license in his car's computer and looked for warrants.

It is simply untenable that to ensure compliance with *Rodriguez*, Officer Turley had to complete the traffic stop by writing a ticket while ignoring information on his mobile data terminal establishing probable cause to arrest Defendant. "When police have reasonable suspicion to conduct a Terry stop, 'founded suspicion to stop for an investigatory detention may ripen into probable cause to arrest through the occurrence of facts or incidents after the stop.'"[132] Although these citation precede the Supreme Court decision in *Rodriguez*, none has been reversed. Further, there is nothing about the general proposition that the mission of a traffic stop may ripen into probable cause to arrest that demonstrates a violation of *Rodriguez* so long as, when all the facts are considered, the Court finds that prior to the ripening of events there was no impermissible prolongation of the traffic stop. To hold otherwise would suggest that upon an officer discovering an active warrant for a driver after making a lawful traffic stop, an officer could not abandon the mission of the stop to make an arrest.

Again, the Court finds there was no prolongation of the traffic stop between the time Officer Turley first approached Defendant's vehicle[133] and when he discovered defendant committed felony by failing to register as a sex offender as required by NRS 179D.550.[134] The mission of the traffic stop had not ended when Turley returned to his vehicle to review information appearing on his computer screen. The request for passenger information was reasonable and safety related given the hour of the day, location of the car, Turley's experience patrolling the area, and that there was no evidence that the car (or its passengers) were in any distress.

---

[132] *Hernandez v. Kunkle*, Case No. C12-178-RSM, 2013 WL 179546, at *4 (W.D. Wash. Jan. 15, 2013) *citing United States v. Greene*, 783 F.2d 1364, 1368 (9th Cir.1986) (citing *United States v. Medina–Gasca*, 739 F.2d 1451, 1453 (9th Cir.1984); *see also Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814 (6th Cir.1999) (collecting cases).
[133] Body Cam at 00.37.
[134] *Id*. at 3:43.

2.    *Turley did not do an impermissible criminal background check on Defendant.*

It is well settled that law enforcement officers may not prolong a traffic stop to do criminal history checks or gather "evidence of ordinary criminal wrongdoing."[135]    Neither of these events occurred here.

In *Evans*, the Ninth Circuit considered whether to suppress evidence discovered after making a valid traffic stop of a known drug dealer.  Following the traffic stop, law enforcement ran a records check to confirm Evans had a valid driver's license and no outstanding warrants.[136]    Officers also ran an ex-felon check and deployed a K-9 to sniff around the car (all of which took about 24 minutes).[137]    This police activity ultimately led to an indictment for conspiracy to distribute methamphetamines, possession with intent to distribute methamphetamines, and carrying a gun "during and in relation to a drug trafficking crime."[138]    On appeal, the court found "that … by conducting an ex-felon registration check and a dog sniff, both of which were unrelated to the traffic violation for which" Evans was stopped, law enforcement "prolonged the traffic stop beyond the time reasonably required to complete . . . [the] traffic mission, and so violated the Fourth Amendment, unless there was independent reasonable suspicion justifying each prolongation."[139]    The court explained that the ex-felon check was "wholly unrelated" to the mission of ensuring cars on the road are "operated safely and responsibly."[140]    Instead, the purpose of this check was to detect "evidence of ordinary criminal wrongdoing."[141]    In fact, the on-scene law enforcement officer testified at the evidentiary hearing that he believed there was "something more than a simple traffic violation" at issue, and admitted that the gathering of information "had no relation to the traffic violation or" the driver's whereabouts.[142]

The facts before this Court substantially differ from those in *Evans*.  Here, Officer Turley did one query by entering Defendant's driver's license into the blank box that appeared on the

---

[135]    *United State v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015).
[136]    *Id*. at 782.
[137]    *Id*. at 782-784.
[138]    *Id*. at 784.
[139]    *Id*. at 786 (citations and internal quote marks omitted).
[140]    *Id*.
[141]    *Id*.  (citations and internal quote marks omitted).
[142]    *Id*. at 786-87.

1    computer in his patrol vehicle.[143]  The query was entered on the same screen Turley uses in all traffic

2    stops.[144]  The terminal automatically generated a list of sources including Nevada DMV, LVMPD

3    Scope, NCIC, and NCJIS.[145]  When Turley highlighted one of the source entities on the list, the

4    system automatically displayed information from that source on the bottom of his screen.[146]  This is

5    how Turley looks for driver information and warrants in all traffic stops.[147]  The Body Camera shows

6    Turley highlighted NCJIS and, without delay, found Defendant's outstanding felony.[148]  This is the

7    same location Turley would look for warrants, and Turley did no special search to find this

8    information.[149]  Turley's testimony is uncontroverted.  Running a routine check on a defendant's

9    record is not prohibited by *Rodriguez*.  As shown in the Body Camera footage, the information at

10   the bottom of Turley's computer screen is minimal, and that Turley used his thumb to review

11   information not appearing just at the bottom of his screen does not support the conclusion that Turley

12   was doing a general criminal background check or attempting to gather evidence of ordinary criminal

13   wrongdoing.  To the contrary, all Turley stated he was doing was looking for warrants.[150]  As stated

14   in *Hicks*, "even after *Rodriguez*, the Fourth Amendment is not as persnickety as" Defendant

15   asserts.[151]

16        The Court finds that the review done by Turley, following his routine records search on

17   Defendant, did not violate the Fourth Amendment.  There is no evidence to support the conclusion

18   that Officer Turley's search measurably or impermissibly prolonged the traffic stop or that he was

19   searching for Defendant's general criminal background or to discovery other criminal wrongdoing.

20

21

22

---

23   [143]    Body Cam at 3:20.  During testimony, Turley explained he initially entered Defendant's driver's license

24   information wrong and had to reenter it.
     [144]    Test. at 10:29:30-10:29:14.

25   [145]    *Id*. at 10:00:50-10:01:04; 11:03.
     [146]    *Id*. at 11:26:13-11:26:56.30.

26   [147]    *Id*.  at  10:00:27-10:00:42;  10:01:04-10:01:16;  10:01:44-10:02:23;  10:29:03-10:29:14;  10:30:12-10:30:22;

     11:34:00-11:34:06.

27   [148]    Body Cam at 3:30-3:44.
     [149]    *Id*. at 10:01:05-10:01:16; 10:02:05-10:02:12; 10:29:28-10:29:45; 10:30:12-10:30:22.

28   [150]    *Id*. at 10:00:27-10:00:42.
     [151]    *Hicks*, 2019 WL 2905047, at *12.

1
2
    C.      <u>The inventory search of Defendant's car is challenged as an extension of an alleged impermissibly prolonged traffic stop.</u>

3         Inventory searches are a well accepted "exception to the warrant requirement[ but that] . . .
4 they must be performed in strict accord with the police department's constitutionally sufficient[]
5 standard procedure to ensure that the search is not just a ruse for a general rummaging to discovery
6 incriminating evidence."[152] Here, there is no dispute that the inventory search of Defendant's vehicle
7 "was conducted in accordance with LVMPD's standard procedure." As Officer Turley explained,
8 he called for a tow because he had probable cause to arrest Defendant, the car was illegally parked,
9 and no other occupant of the car had a driver's license.[153] The upcoming tow prompted the required
10 pre-tow inventory search. There is nothing in Defendant's Motion to Suppress, Reply brief, cross-
11 examination of Officer Turley or closing argument that suggests or infers the inventory search was
12 conducted in a manner that violated the Fourth Amendment. Rather, it is that the inventory search
13 was done after what Defendant contends is an impermissibly prolonged traffic stop that supposedly
14 taints the search.

15         Because the only licensed driver of a car illegally parked on a public roadway was arrested,
16 and there was no impermissible prolongation of the preceding traffic stop, Officer Turley properly
17 called for a tow, and the pre-tow inventory was lawfully conducted. The discovery of two firearms
18 located during the lawful inventory search did not violate the Fourth Amendment. Thus, there is no
19 reason to suppress the evidence found during the inventory search.

20 **IV.    RECOMMENDATION**

21         Accordingly, IT IS HEREBY RECOMMENDED that Defendant's Motion to Suppress
22 Evidence (ECF No. 32) be DENIED.

23         Dated this 22nd day of March, 2021.

24
25                              ELAYNA J. YOUCHAH
26                              UNITED STATES MAGISTRATE JUDGE

27 [152]     *United States v. Gibson*, Case No. 2:16-cr-00333, 2017 WL 3438450, at *4 (D. Nev. August 10, 2017) (citations omitted); *U.S. v. Centers*, Case No. 2:13-cr-0125, 2013 WL 7019875, at *9 (D. Nev. December 19, 2013) ("an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence").
28 [153]     Test. at 10:07:42-10:08:47.

1

**<u>NOTICE</u>**

2        Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be

3  in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has

4  held that the courts of appeal may determine that an appeal has been waived due to the failure to file

5  objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also

6  held that (1) failure to file objections within the specified time and (2) failure to properly address

7  and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal

8  factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir.

9  1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28