# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff<br><br>v.<br><br>Shawn Michael McCowan,<br><br>    Defendant | Case No.: 2:20-cr-00151-JAD-EJY<br><br>**Order Granting Motion to Suppress**<br><br>[ECF Nos. 32 & 58] |

    This case presents the question of whether extending a parking-violation car stop, in order to obtain identifying information from the passengers, impermissibly prolongs the stop so as to taint the entire seizure and require suppression of its fruits. The Supreme Court's 2015 decision in *Rodriguez v. United States* established that police conduct that exceeds the narrow mission of a traffic stop and "adds time to" the stop "violates the Constitution's shield against unreasonable seizures."[1] The officer here took a 40-second detour from his investigation of the driver to ask the passengers for identification—which they lacked—and then for their names and birthdates, purportedly for officer safety, before running the driver's information and discovering that he had violated sex-offender registration laws. That violation led to his arrest, an inventory search of the car, and the discovery of two firearms for which he now faces a felon-in-possession charge. The driver moves to suppress those guns, arguing *inter alia* that the officer's questioning of the passengers impermissibly extended the stop. Because the Ninth Circuit, in applying *Rodriguez*, has held that such passenger inquiries are not part of the mission of a traffic stop and do not foster officer safety, and the government has shown no other basis to avoid exclusion, I grant the motion to suppress.

---

[1] *Rodriguez v. United States*, 575 U.S. 348, 350, 357 (2015).

# Background

## A.     Factual background[2]

While patrolling South Las Vegas Boulevard around midnight, Las Vegas Metropolitan Police Department officer Lukas Turley noticed a sedan stopped in a no-parking zone on Agate Avenue.[3]  According to Turley, Agate Avenue is situated between an apartment complex known to house sex workers and pimps, and a hotel frequented by narcotics traffickers.[4]  When the officer pulled up behind the car, which had no lights on and showed no signs of distress, it began to drive away,[5] so he initiated a traffic stop.[6]  Though the area and vehicle's location were suspicious to Turley, he testified that the only basis he had to pull the car over was the parking violation.[7]

Turley called for backup, relayed the vehicle information to dispatch, and then approached the car.[8]  Inside, he found three individuals—McCowan, a black man, in the driver's seat; a woman in the front passenger seat; and a man in the seat behind McCowan.[9]  Turley began his routine questioning of McCowan for the stop.  He inquired why the car was parked

---

[2] This is a summary of Officer Turley's testimony at the evidentiary hearing.  That testimony is uncontroverted and consistent with the magistrate judge's factual findings, which I agree with and adopt.

[3] Suppression-hearing recording (03/04/2021) (hereinafter "Hr'g") at 9:51:53–9:52:02 a.m.

[4] *Id.* at 9:52:39–9:52:53 a.m., 9:57:50–9:58:27 a.m.

[5] *Id.* at 9:53:27–9:53:57 a.m.

[6] *Id.* at 9:54:21–9:55:35 a.m.

[7] *Id.* at 9:57:17–9:57:45 a.m.; *see id.* at 53:30–53:35 a.m. (testifying that he pulled the car over to "complete a" "query on the license plate").

[8] *Id.* at 9:55:41–9:55:45 a.m.; McCowan's Ex. B to ECF No. 32 at 00:26–00:38 (hereinafter "Body Cam").

[9] Hr'g at 9:56:08–9:56:23 a.m.; Body Cam at 00:38–42.

2

where it was, and he asked McCowan for his license.[10]  As McCowan fumbled for his I.D., Turley turned to the passengers.[11]  He asked both if there were weapons in the car.[12]  Turley then asked the back-seat passenger if he had any identification or had ever had a driver's license.[13]  McCowan then handed over his license.[14]

With McCowan's license in hand, Turley asked the front-seat passenger if she had any identification.[15]  When she had none, he asked both passengers for their names and birthdates.[16]  Having gathered everyone's identifying information, Turley returned to his patrol car to run McCowan's license, check whether it was valid, and determine whether he had any outstanding warrants.[17]  That search revealed that McCowan had failed to timely register as a sex offender in this state, which is a felony under Nevada law.[18]  At that moment, the stop's mission shifted: it was no longer about McCowan's parking violation, but instead focused entirely on McCowan's potential failure-to-register felony.

Cognizant of the risk of attempting an arrest while outnumbered, Turley waited for his backup to arrive before returning to McCowan's car.[19]  While he waited, he ran the passengers' names and information.  That search revealed that the front-seat passenger had given false

---

[10] Hr'g at 9:56:53–9:56:03 a.m.; Body Cam at 00:41–1:16.

[11] Body Cam at 1:14.

[12] *Id*. at 1:15–17.

[13] *Id*. at 1:16–39.

[14] *Id*. at 1:30.  Turley did not ask for McCowan's car registration or proof of insurance.  Hr'g at 9:57:17–9:57:45 a.m.; Body Cam at 1:11–2:14.

[15] Body Cam at 1:33.

[16] *Id.* at 1:33–2:12; *see* Hr'g at 9:58:37–9:59:45 a.m.

[17] Hr'g at 9:59:56–9:59:59 a.m., 10:00:16–10:02:14 a.m.

[18] *Id.* at 10:02:34 a.m.

[19] *Id.* at 10:02:52–10:03:01 a.m.

3

identification information, and Turley ultimately discovered outstanding warrants for both passengers. When backup arrived, the officers together arrested all three occupants of the car and impounded it. A subsequent inventory search of the car turned up two loaded guns.

**B.      Procedural history**

A federal grand jury indicted McCowan on a single count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) based on those two guns.[20] McCowan moves to suppress those firearms, arguing that two of Turley's actions unconstitutionally extended the originally lawful stop, tainting the entire seizure. First, he contends that Turley's exchange with the passengers was not related to the mission of the parking violation or necessary to ensure the officer's safety. Second, he argues that, when running McCowan's information on the patrol-car terminal, Turley continued scrolling through the results to find non-traffic-stop-relevant details about him.

The motion was referred to the magistrate judge, who conducted an evidentiary hearing at which Turley testified about the stop. She found that Turley was a credible witness and that there was reasonable suspicion for the stop.[21] She concluded that Turley's questions to the passengers did not impermissibly extend the stop because they were asked for officer-safety purposes and that the single computer search did not measurably extend the stop. So she recommends that I deny McCowan's motion.[22] McCowan objects to that recommendation, reiterating the arguments from his initial motion, and adding that the request-for-passenger-information cases that the government and the magistrate judge relied on are inapposite.[23] The

---

[20] ECF No. 11 (indictment).
[21] ECF No. 58 at 9–10 (report and recommendation).
[22] *Id.* at 11–18.
[23] ECF No. 59.

4

government offers a five-sentence opposition that merely directs me to consider its prior briefing and makes no attempt to respond to the substance of McCowan's twelve-page objection.[24] I held a hearing to elicit additional oral argument.[25]

When a magistrate judge provides findings and recommendations in a criminal case, the district judge "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."[26] Challenged portions of the report must be reviewed de novo.[27] Having carefully reviewed the officer's body-camera footage, Turley's testimony at the evidentiary hearing, the parties' arguments, and the magistrate judge's findings and recommendation, I find that the time spent asking for passenger information after securing McCowan's driver's license exceeded the stop's mission and was not related to a genuine safety purpose. So I sustain McCowan's objection, reject the legal conclusions in the magistrate judge's report and recommendation related to the passenger questioning, and grant the motion to suppress. And because I find that the passenger questioning alone requires suppression, I don't reach McCowan's remaining arguments.

---

[24] ECF No. 61.
[25] ECF No. 65 (minutes of 6/14/21 hearing). No additional evidence was elicited at that hearing.
[26] Fed. R. Crim. P. 59(b)(3); 18 U.S.C. § 636(b)(1).
[27] *Id*.

**Analysis**

This case springs from one of the most fertile breeding grounds for Fourth Amendment jurisprudence: the traffic stop. Such stops "are 'presumptively temporary and brief,'" and most "last only a few minutes."[28] Still, they are seizures within the meaning of the Fourth Amendment[29] and "can become unlawful if . . . prolonged beyond the time reasonably required to complete [the] mission" of the stop.[30] The Supreme Court in *Rodriguez* clarified that the mission of the stop is narrow and includes only "determining whether to issue a traffic ticket"; "ordinary inquiries incident to" that stop, like "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"; plus "negligibly burdensome precautions" that the officer needs "to complete his mission safely."[31] "On-scene investigation into other crimes, however, detours from that mission," as do "safety precautions taken in order to facilitate such detours."[32] Against this legal framework I analyze whether Officer Turley's 40-second exchange with McCowan's passengers after he obtained McCowan's license measurably prolonged this seizure

---

[28] *United States v. Gorman*, 859 F.3d 706, 714 (2017) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)).
[29] *Whren v. United States*, 517 U.S. 806, 809–10 (1996).
[30] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).
[31] *Rodriguez*, 575 U.S. at 355–56.
[32] *Id*. at 356.

beyond the "time reasonably required to complete the stop's mission,"[33] requiring me to suppress the guns.

### A. The mission of the stop was constrained to the parking violation.

The mission of a traffic stop "justified only by a police-observed traffic violation" is limited to actions directly related to addressing that violation.[34] "Police simply may not perform unrelated investigations that prolong a stop unless they have 'independent reasonable suspicion justifying the prolongation.'"[35] The government concedes that Officer Turley's mission was to investigate a parking violation.[36] So does Turley.[37]

The Ninth Circuit recognized in *United States v. Landeros* that "[a] demand for a passenger's identification is not part of the mission of a traffic stop."[38] The "ordinary inquiries incident to [a] traffic stop . . . share[] the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. The identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle."[39] That identity would seem to bear even less relevance to a parking violation than a moving violation.

---

[33] *Id*. at 357 (quoting *Caballes*, 543 U.S. at 407).
[34] *Id.* at 350–51 (citing *Caballes*, 543 U.S. at 407).
[35] *Gorman*, 859 F.3d at 715 (quoting *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015)).
[36] At the June 14, 2021, hearing on defendant's objection, this exchange occurred:

> The Court: So I think we all agree then the mission was to investigate a no-parking violation.
>
> Government counsel: Yes, Your Honor. . . . the mission was investigating the no-parking and that's why he ran his license.

[37] Hr'g at 9:57:17–9:57:45 a.m.
[38] *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019).
[39] *Id*.

7

And nothing in this record suggests that the identity of McCowan's passengers had any relevance at all to this parking infraction.

The government attempts to enlarge the mission of this stop by characterizing the circumstances of the parking violation as "suspicious." To extend this stop to investigate the passengers, however, the officer needed independent reasonable suspicion of a crime,[40] and he lacked the articulable facts[41] to establish it here. Turley testified that it was strange to see a car parked on Agate Avenue because, in his time patrolling that area, traffic was limited on that road.[42] And he claims that the road's proximity to buildings known for facilitating prostitution and drug trafficking added to his suspicion.[43] But this testimony supplies at best the "inchoate and unparticularized suspicion or 'hunch'" that the Supreme Court in *Terry v. Ohio* found insufficient for reasonable suspicion.[44] Regardless, Turley does not claim that his passenger inquiry was based on that suspicion; he maintains that the reason he asked the passengers for their information was his safety.

**B.    The questions to the passengers were not related to officer safety.**

Because traffic stops "are 'especially fraught with danger to police officers,'" the Supreme Court has long held that the traffic-stop mission includes "certain negligibly

---

[40] *Rodriguez*, 575 U.S. at 355 (noting that an officer may not extend a stop "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").

[41] Reasonable suspicion must be "supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30 (1968)).

[42] Hr'g at 9:51:53–9:52:02 a.m., 9:53:07 a.m.

[43] *See id.* at 9:57:50–9:58:27.

[44] *Terry*, 392 U.S. at 27. Had the officer testified, for example, that in his years of patrolling that street he had arrested people there in similarly parked cars for the crimes he claims go on nearby, Turley may have been able to make such a showing.

burdensome precautions," unrelated to the traffic violation, that an officer may need to take "in order to complete his mission safely."[45] It noted in *Rodriguez* that those safety concerns must be "related" to the actual stop.[46] Ninth Circuit cases applying *Rodriguez* have recognized that an officer cannot make an unconstitutional detour lawful by merely labeling it as an officer-safety measure; the act must genuinely promote officer safety. In *United States v. Evans*, for example, the Ninth Circuit found that adding time to an unlawful-lane-change stop to gather information about the driver's ex-felon registration status and to conduct a dog sniff of the car "in no way advanced officer safety" and was actually "inversely related to officer safety."[47] The officer "would have been safer had he let [the driver] go once he determined there was no reason to cite him," instead of extending the stop to perform the additional investigations.[48] Four years later in *Landeros*, the court rejected an officer-safety rationalization for a passenger inquiry. "Knowing" the passenger's "name would not have made the officers any safer," the court reasoned.[49] "Extending the stop, and thereby prolonging the officers' exposure to [the passenger] was, if anything, 'inversely related to officer safety.'"[50]

---

[45] *Rodriguez*, 575 U.S. at 356. Such precautions would include, for example, ordering the driver and passengers out of the car to prevent them from reaching secreted weapons stashed inside a vehicle. *See id*. (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977) (driver); *Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997) (passengers)).

[46] *Rodriguez*, 575 U.S. at 354 (explaining that the stop cannot exceed the amount of time needed to "address the traffic violation that warranted the stop and attend to related safety concerns").

[47] *Evans*, 786 F.3d at 787.

[48] *Id*.

[49] *Landeros*, 913 F.3d at 868.

[50] *Id*. (quoting *Evans*, 786 F.3d at 787). The government argues that *Landeros* does not prohibit law enforcement from asking passengers for identification without violating the Fourth Amendment. It relies primarily on my decision in *United States v. Hicks*, 2:18-cr-00374-JAD-CWH, 2019 WL 2905047 (D. Nev. Jul. 5, 2019), and the pre-*Rodriguez* decision of *United States v. Diaz-Castenada*, 494 F.3d 1146 (9th Cir. 2007). Hr'g 12:39:09–12:40:31, 12:43:26–12:44:41 p.m. The magistrate judge's report does, too. *See* ECF No. 58 at 13–15. While both

Turley's rationalization of his passenger investigation as an officer-safety move, even if sincere, is unsound. He testified that because he was working alone at night in a "high[-]crime area," he wanted to "know who [he was] talking to."[51] But the government[52] has not shown that educing McCowan's passengers' identities, one of which turned out to be fake, made this officer any safer. As the Supreme Court has observed, "the possibility of a violent encounter [during a car stop] stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver."[53] The limited investigation into McCowan's passengers' identities—like the *Evans* and *Landeros* detours—only increased the likelihood of a violent

---

cases held that a passenger inquiry did not violate the Fourth Amendment, their facts are materially distinguishable from this case, rendering them inapposite. In *Hicks*, there were two officers, and the passenger investigation occurred simultaneously with the investigation of the driver, so there was no measurable extension of the stop. *Hicks*, 2019 WL 2905047 at *2 ("Any investigation into Hicks's background and criminal history ran parallel to the investigation of [the driver's] handicapped-parking violation and thus never prolonged the traffic stop's mission."). And in *Diaz-Castenada*, the officer requested the passenger's identification only after he learned that the driver had a suspended license and could not leave with the car. *Diaz-Castenada*, 494 F.3d at 1148. So the mission of that stop included the need "to 'discover if [the passenger] had a valid license so he could take the vehicle'" to avoid towing it after the driver's arrest. *Id*.

[51] Hr'g. at 9:58:37–9:58:45 a.m.

[52] When asked at the hearing for facts or authority to support this officer-safety claim, the government merely offered to supply additional briefing to answer that question. While I appreciate the government's willingness to supplement its submission, such information would have been far more helpful in the actual briefing, and that opportunity was squandered. *See* ECF No. 61 (offering as the entire substance of its objection response, "[f]or the reasons set forth in the Report and Recommendation, the Magistrate Judge properly denied defendant's motion by finding there was reasonable suspicion for the investigatory stop, the valid traffic stop was not impermissibly prolonged, and the inventory of the defendant's car was lawful. The Government further relies on, and incorporates by reference, its arguments set forth in the Government's Response to Motion to Suppress.") (internal citations omitted).

[53] *Wilson*, 519 U.S. at 414.

encounter. They had illegal guns and drugs in the car, the front-seat passenger knew she had given the officer a false name, and both passengers may have also suspected that the officer would discover outstanding warrants for their arrest. When backup had already been called and its arrival was imminent, this digression was inversely related to officer safety. The questions to the passengers were therefore not part of the mission of this stop.

**C.     The passenger inquiry measurably added time to the stop.**

Not all detours from a traffic-stop mission render the seizure unconstitutional—just those that "measurably extend the duration of the stop."[54] The magistrate judge concluded that this less-than-one-minute, *de minimis* intrusion did not measurably prolong the stop, and the government in its opposition stresses the brevity of the entire encounter.[55] But the High Court in *Rodriguez* specifically rejected a *de minimis* exception when reversing the lower courts' ruling that "the extension" of the stop was "permissible because of its brevity."[56] So, after *Rodriguez*, an extension for a non-mission purpose violates the Fourth Amendment if it "prolongs—i.e., adds time to—the stop."[57] Because Turley's questioning of the passengers after he obtained McCowan's driver's license added 40 seconds[58] to this stop, which is a measurable length of time,[59] the seizure was unlawful under *Rodriguez* and its Ninth Circuit progeny.

---

[54] *Rodriguez*, 575 U.S. at 355.

[55] ECF No. 58 at 14–15; ECF No. 36 at 5.

[56] *Landeros*, 913 F.3d at 866–87 (explaining the *Rodriguez* ruling and noting that it "squarely rejected such a reasonableness standard for determining whether prolonging a traffic stop for reasons not justified by the initial purpose of the stop is lawful").

[57] *Rodriguez*, 575 U.S. at 357 (internal quotations omitted).

[58] These 40 seconds do not include the first few seconds of Turley's questioning of the backseat passenger, which was conducted while McCowan was still searching for his driver's license.

[59] The New Oxford American Dictionary defines "measurable" as "able to be measured," "large enough to be measured; noticeable; definite." New Oxford American Dictionary, 1052 (2d ed. 2005). Illustrating the point that even a mere-seconds detour is measurable, the Third Circuit in

11

**D. The government has not met its burden to show a basis to spare the guns from exclusion.**

Having concluded that the seizure was rendered illegal by the improper extension to investigate the passengers' identity, I turn to the question of the proper remedy for this constitutional violation. It is well established that evidence obtained in violation of the Fourth Amendment is subject to suppression under the exclusionary rule.[60] "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"[61] In determining whether to suppress evidence, "[t]he focus is on the causal connection between the illegality and the evidence."[62]

Whether there is such a causal connection here turns on whether "the illegality" is the entire stop or just the unlawful portion of it. The guns were not discovered as a result of the 40-second detour into the passengers' identities. They were discovered because the computer check on McCowan revealed his failure-to-register status, leading to his arrest, the impounding of his vehicle, and the ultimate inventory search of the car. That chain of events would have unfolded even if Turley had not deviated from the mission to investigate the passengers. So, if the illegality is the impermissibly extended portion of the stop, there is no causal connection

---

*United States v. Clark*, 902 F.3d 404, 410 n.4 (2018), held that "[t]he Government's argument that the brevity (20 seconds) of the criminal history questioning does not support it being off-mission . . . fails given the Supreme Court's explicit rejection of a *de minimis* exception in *Rodriguez*."

[60] *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963).

[61] *United States v. Pulliam*, 405 F.3d 782, 785 (9th Cir. 2005) (citation omitted).

[62] *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989) (quoting *Dunaway v. New York*, 442 U.S. 200, 217–18 (1979)).

between the illegality and the evidence. But if the illegality is the stop as a whole, there is a causal connection because the stop set in motion the events that led to the guns.

Although some courts have held that the evidence must derive from the unlawful part of the stop for suppression to be required,[63] the Ninth Circuit has not yet decided this issue. It did, however, predict a future need to do so in *United States v. Gorman*. There, the court considered "the effect of [a] first, concededly unconstitutional, detention on [a] second stop" of the motorist, and found "that the illegality of the first detention 'tainted' the evidence obtained during the second stop."[64] The *Gorman* court described the fruit-of-the-poisonous-tree doctrine and its focus on the causal connection between the illegality and the evidence sought to be suppressed.[65] It noted that the government did not argue that the doctrine "is only applicable if the impetus for the second stop came from the unlawful portion of Gorman's detention."[66] But the court did not need to "determine whether it would be appropriate to divide an unlawful detention into lawful and unlawful portions for purposes of 'fruit of the poisonous tree' analysis" because the record clearly showed "that part of the impetus for the second stop *did* come from the unlawful portion of Gorman's detention," establishing that causal connection.[67] The court emphasized, "however,

---

[63] *United States v. Gomez-Arzate*, 981 F.3d 832, 841 (10th Cir. 2020) (affirming the denial of suppression motion in which the defendants failed to show that the evidence would not have come to light but for the officer's improper prolonging of a traffic stop); *United States v. Cone*, 868 F.3d 1150, 1155 (10th Cir. 2017) (affirming the denial of a suppression motion when an officer's questions about a driver's travel plans were not the but-for reason for the evidentiary discovery and explaining that the officer would have ran a background check, ordered the defendant out of his car, and found the evidence regardless of whether he asked about the driver's travel plans).

[64] *Gorman*, 859 F.3d at 716.

[65] *Id.*

[66] *Id.* at 717.

[67] *Id.* (emphasis original).

that had the government attempted to argue that only the legal portion of the initial detention provided the impetus for the second stop, it would need to make a clear showing to carry its burden in this respect . . . ."[68]  Indeed, the government bears the ultimate burden to demonstrate "that the evidence is not 'the fruit of the poisonous tree.'"[69]

Here, the government has not attempted to argue that the stop should be severed into lawful and unlawful portions or that the discovery of these guns was not the but-for result of the passenger investigation.[70]  So even if I were to read *Gorman* to suggest that the Ninth Circuit would spare from exclusion evidence that is not causally connected to the impermissibly extended portion of this stop, the government has not made "a clear showing to carry its burden in this respect."[71]  Because the government has not met that burden, I grant the motion to suppress.

---

[68] *Id*. at 717 n.7.

[69] *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000) (quoting *Johns*, 891 F.2d at 245).

[70] *See* ECF No. 36 at 6 ("The recovery of the firearms occurred as the result of a lawful inventory search conducted pursuant to LVMPD's standard policy").  Additionally, this exchange occurred during the oral argument on the objection:

>The Court:  Let's assume I find that . . . the collecting of the passengers' names and personal information impermissibly prolonged this stop.  Is there some exclusionary rule proposition that would save this evidence from exclusion?
>
>Government counsel:  Again, Your Honor, I would have to do a little bit more research on that. . . .

[71] *Gorman*, 859 F.3d at 717 n.7.

## Conclusion

IT IS THEREFORE ORDERED that McCowan's objection to the magistrate judge's report and recommendation **[ECF No. 59] is SUSTAINED**.

IT IS FURTHER ORDERED that the magistrate judge's recommendation to deny McCowan's motion to suppress **[ECF No. 58] is REJECTED**, and McCowan's motion to suppress **[ECF No. 32] is GRANTED**. The evidence from the vehicle inventory search will be excluded.

_____
U.S. District Judge Jennifer A. Dorsey
July 7, 2021